Parker J. Stone, J.
Petitioner has commenced a special proceeding challenging the validity of a specification prepared by respondent for the supply of fuel oil to the State of New York. The respondent has moved to dismiss the petition upon the grounds that the petitioner has no standing upon which to commence this proceeding and that the petition fails to state a cause of action.
Petitioner is a corporation which in the past has supplied certain types of fuel oil to the State of New York and its political subdivisions. Initially, petitioner was a successful bidder on a portion of a contract to supply fuel oil for a contract period from October 1, 1973 to September 30, 1974. Upon the expiration of the contract on September 30, 1974, petitioner was notified to continue supplying the State and its political subdivisions with fuel oil under the same terms and conditions as specified in. the expired contract, and petitioner has done so up to the present time.
In the contract which expired on September 30, 1974, price adjustments between petitioner and the State for the fuel oil being supplied by petitioner, were based upon the difference between the published prices on July 30, 1973 and the prices published in the Journal of Commerce and Oil Buyers Guide on subsequent specified dates of publication. These publications are two petroleum trade journals published daily and weekly respectively.
On or about January 14, 1976, petitioner was notified by respondent of respondent’s intention to revert to the competitive bidding process for the supply of fuel oil and in seeking bidders for a contractual period scheduled to commence April 1, 1976, the respondent forwarded to prospective bidders, *403 including petitioner, Specification No. 288 for Commodity Group 05500- Fuel Oil, Burner (NYS Standard). This specification includes the following "Price Adjustment Clause” which petitioner contends renders the specification in violation of section 174 of the State Finance Law.
"Bidder must insert in the proposal the name of the publication or other basis on which the bid is made. Bidders with their own storage facilities who base their prices on their own company’s post price must so indicate in the proposal. Dealers who base prices on their supplier’s posted price shall state the name of the supplied [sic] and location of terminal. All bidders must indicate in the proposal the posted price on February 9, 1976 and submit with their bid a copy of the official posting. This will be used as the basis for change during the contract period by adding to or subtracting from the original contract price, the difference between the referenced posted price on February 9, 1976, and the revised posting submitted to OGS for approval.
"Request for an increase in price will be considered only once during any calendar month starting from the date of the award but may be based on any day’s posting during that month.
"Increases must be requested in writing by the contractor and submitted for approval to the Office of General Services within seven (7) days of the effective date. This submission must include a copy of the reference posting on which the change is based and the total revised price per gallon for all types of oil by county concerned. In addition, the change’s compliance with all existing Federal price guidelines must be documented. The State reserves the right to require verification and the right to audit the records used in the computation of the requested increase.
"Decreases in cost will be reported as described above and the same rights reserved by the State, except all cost reductions will be reported immediately and such decreases will be effective as they occur.
"Voluntary allowance will not be considered. Requests for increases to compensate for other increases in the cost of doing business will not be considered.”
Petitioner specifically contests that portion of the price adjustment clause which permits a bidder to base his bid and subsequent price revisions upon his own company’s posted prices as opposed to posted prices found in petroleum trade *404 journal publications. Petitioner urges that this gives an unfair advantage to prospective bidders who may use their own posting over those bidders who must rely upon the posting found in the trade journals. Petitioner reasons that a bidder using its own posted price as the basis of a bid could thereafter, upon being awarded a contract, increase his own posted price and immediately ask for revisions and price adjustments based upon that increase. Moreover, petitioner contends that not only does this limit competitive bidding initially, but permits the contract to be awarded to a bidder who by reason of price revisions, based upon his own posted prices, may not, in fact, remain the lowest bidder over the entire length of the contract. Petitioner claims that an increase of one cent in a contract price can mean thousands of dollars to the State and that the only fair and equitable manner in which to insure competitive bidding is to require contract price adjustments to be based upon standardized posted prices such as those which are found in the afore-mentioned petroleum trade journals.
Respondent counters that the subject price adjustment procedure was adopted in order to eliminate objections by various suppliers that the price listings in the petroleum trade journals do not clearly reflect the price changes they experience. For example, suppliers in the western part of the State complained that the Journal of Commerce posting utilized by the State, i.e., the low New York Barge reseller prices (types 1 to 4 and 6 low sulphur) and low Albany tank car reselling prices (types 4, 5 and 6 regular grades) did not adequately represent cost changes they were required to absorb inasmuch as their source of supply came through the Great Lakes rather than the eastern seaboard. Recognizing the validity of these complaints, the respondent began using the Buffalo Consumer tank car prices as published in the Oil Buyers Guide for certain specified western counties. Respondent relates that when the energy crisis occurred with resulting spiraling price increases, most contractors complained to respondent that they could not stay in business unless they were allowed to increase their prices in accordance with increases charged by their source of supply, and they insisted that published prices did not truly reflect the price increases they were obliged to pay for the product.
Prior to advertising the subject proposal, respondent contracted a cross section of potential bidders for their opinion regarding a realistic basis to be used for subsequent price *405 changes and most of those contacted indicated to respondent that they could not respond favorably to the proposed contract unless they were allowed to select a price change standard which truly reflected their cost structure, rather than be tied into .the posting of selected major firms. In view of this, respondent abandoned its previous policy relating to posted prices and adopted that which is the subject of this proceeding.
Respondent additionally points to its authority pursuant to this specification to cancel any contract if it is found that the requested price increase falls within the following reservation, and urges that this prevents the abuse referred to by petitioner.
"Should the price structure utilized by the parties become unworkable, detrimental or injurious to the State as where reference postings are not truly reflective of current market conditions and are deemed [sic] unreasonable or excessive by the Commissioner and no adjustment in price is mutually agreeable, the Commissioner reserves the sole right upon 10 days written notice mailed to the contractor to terminate any contract resulting from this bid opening. If the contractor is unable or unwilling to meet contractual requirements in whole or in part it shall immediately notify the State of such in order that the State may take appropriate action.”
Initially, the question of petitioner’s standing should be determined. It is undisputed that petitioner is an unsuccessful bidder on these specifications and as such has a standing to bring this proceeding. (Matter of Dictaphone Corp. v O’Leary, 287 NY 491; Matter of Allen v Eberling, 24 AD2d 594.) The issue thus to be decided is whether the specifications in question violate section 174 of the State Finance Law by failing to reasonably insure an award of the contract to the lowest responsible bidder for the contract period.
Respondent derives its authority to let contracts from this statute and it is fundamental that the actions of respondent and its authority are determined solely by its language. Consequently, respondent may not validly adopt a standard which enlarges or alters the authority expressed therein. (American Inst. for Imported Steel v Office of Gen Servs. of State of N. Y., 47 AD2d 118, 119.) This is not to say, however, that the respondent is prohibited from implementing measures which reflect the practicalities of modern day economics to encour *406 age as much participation as possible by the business community in bidding for State contracts.
"The purpose of this statute is to invite competition and thereby furnish the State with the best product at the lowest price practicable. In other words, its purpose is to conserve the taxpayers’ money. This beneficial purpose could easily be neutralized if any group of responsible bidders is wrongfully eliminated.” (Id. at 119).
It is possible, as petitioner implies, that a supplier’s own posted price can be initially manipulated and that subsequent to the awarding of the contract, this supplier may then increase his posted price to obtain an unrealistic, if not a fraudulent, price increase.
A requested price adjustment, however, is not automatically approved but is subject to the scrutiny of the respondent to the extent that the contract may be terminated if found to be "unworkable, detrimental or injurious to the State.” While petitioner assumes that the respondent will not exercise its rights to terminate a contract under those circumstances, such an assumption is unwarranted, in fact and in law. "The general presumption is that public officials * * * act honestly and in accordance with law.” (Matter of Magnotta v Gerlach, 301 NY 143, 149.)
It is also possible, as petitioner contends, that by reason of price adjustments, the contractor may not throughout the entire contract remain the lowest bidder in comparison with other suppliers in the industry. Such a possibility is not fatal, however, for it has been recognized that if such a result does occur, the law is not violated in the absence of fraud or collusion. (Cf. Reilly v Mayor, Aldermen & Commonalty of City of New York, 111 NY 473.)
Erratic prices within the fuel industry are a matter of public knowledge and respondent, without contradiction, has substantiated the fact that this is a legitimate concern of those who are prospective suppliers of fuel to the State. The subject price adjustment clause was drafted by the respondent to meet this problem. Those charged with responsibility of decision making should have their decisions upheld. Mere possibilities and assumptions do not substantiate judicial intervention. In order to form a basis for judicial intervention, "it must be demonstrated that the method used in awarding of the contract was clearly arbitrary and without authority or foundation (Matter of Kayfield Constr. Corp. v Morris, 15 *407 AD2d 373; Matter of Kaelber v Sahm, 281 App Div 980, affd 305 NY 858; Matter of Graziani v Rohan, 10 AD2d 154, affd 8 NY 2d 967)” (Matter of Margrove, Inc. v Office of Gen. Servs. of State of N. Y, 51 Misc 2d 596, 599, affd 27 AD2d 321.)
Respondent’s obligation to include all groups of responsible bidders mandates that economic realities be recognized and provided for within the subject specifications. Respondent has appropriately done so.
The petition is dismissed for failure to state a cause of action.